IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| RICHARD RICE, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 11 C 8762 |
| | ) | |
| ADP TOTALSOURCE, INC., as Plan | ) | Judge Virginia M. Kendall |
| Administrator of the ADP TOTALSOURCE, | ) | |
| INC. HEALTH AND WELFARE PLAN, the | ) | |
| ADP TOTALSOURCE, INC. HEALTH AND | ) | |
| WELFARE PLAN and AETNA LIFE | ) | |
| INSURANCE CO., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard Rice ("Rice") filed this suit against Aetna Life Insurance Company ("Aetna"), ADP TotalSource, Inc. ("ADP"), and ADP TotalSource, Inc. Health and Welfare Plan ("the Plan) pursuant to Section 501(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1132(a)(1)(B). Rice alleges he was denied disability insurance benefits to which he is entitled under an employer-sponsored benefit plan subject to ERISA. Rice and Aetna have filed cross-motions for summary judgment. In spite of the unfortunate circumstances and the misfortune of a matter of hours defining the difference as to whether Rice can receive benefits, the Court denies Rice's Motion for Summary Judgment and grants Aetna's Cross-Motion for Summary Judgment. This is one of those circumstances in a judge's review of the law when 'how one wishes to decide a case comes lightly to mind, on a wing; but often how one must decide it comes arduously, weighed down by somber thought.' " (quoting *De Letelier v. Republic of Chile*, 748 F.2d 790, 791 (2d Cir. 1984), *cert. denied*, 471 U.S. 1125 (1985).

1

## STATEMENT OF MATERIAL UNDISPUTED FACTS[1]

ADP provided long-term disability insurance benefits to eligible employees as part of an employee welfare benefit plan. (Def. 56.1 St. ¶ 3.) These benefits were funded by an insurance policy (the "Policy") issued by Aetna. (*Id.* ¶ 5.) Rice was hired by Westin Engineering, Inc., a subsidiary of ADP, on July 8, 2009 and became eligible for benefits under the Policy on August 1, 2009.[2] (Def. 56.1 Resp. ¶ 11; AR 81.)

### I.     Rice's Treatment

On July 6, 2009, two days before beginning his employment with Westin, Rice presented complaints of headaches to his primary care physician, Dr. Jorge Balandrin. (*Id.* ¶ 14; AR 103.) Dr. Balandrin recommended that Rice undergo a brain MRI and MRA.[3] (*Id.*)  Rice underwent a

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Aetna's Statement of Facts (Dkt. No. 25) have been abbreviated to "Def. 56.1 St. ¶ __"; citations to Rice's Statement of Facts (Dkt. No. 46) have been abbreviated to "Pl. 56.1 St. ¶ __"; citations to Rice's Response to Aetna's Statement of Facts (Dkt. No. 62) have been abbreviated to "Pl. 56.1 Resp. ¶ __."; and citations to Aetna's Response to Rice's Statement of Facts (Dkt. No. 49.) have been abbreviated to "Def. 56.1 Resp. ¶ __." Citations to Aetna's Life Insurance Policy (Dkt. No. 25, Exs. 2-6) have been abbreviated to "Policy __"; Citations to the Administrative Record (Dkt. No. 26, Exs. 1-6) have been abbreviated to "AR __."

[2] Rice argued in his Motion for Summary Judgment that the terms of the Policy are vague with respect to the date he became eligible for benefits and that under the terms of the Policy he was covered under the Plan as of his first day of work. (Dkt. No. 56, p. 6.)  However, Rice has since conceded that he became eligible under the Policy on August 1, 2009. (Def. 56.1 St. ¶ 11; Pl. 56.1 Resp. n. 1 ("There is not a lot of dispute as to the facts of this case.  Plaintiff will respond only to those paragraphs of the Defendant's Statement of Facts to which there is some dispute.  The remaining paragraphs will be considered admitted.").  In any event, the policy unambiguously states that a participant's coverage begins "the first day of the month coinciding with or next following completion of the worksite's waiting period; or day worksite employer becomes covered under the plan." (Policy 98.)  Because it is undisputed that Rice's employer was covered under the Plan before Rice began his employment with Westin, the second portion of the quoted provision does not apply to Rice.

[3] An MRI or "Magnetic Resonance Image" is a test that uses a magnetic field and pulses of radio wave energy to create pictures of organs and structures of the body. http://www.webmd.com/a-to-z-guides/magnetic-resonance-imaging-mri.  An MRA or "Magnetic Resonance Aniogram" uses the same technology to provide pictures of blood vessels inside the body. http://www.webmd.com/heart-disease/magnetic-resonance-aniogram-mra.

brain MRA and MRI on July 31, 2009, one day before his effective date of coverage. (*Id.* ¶ 15; AR 106.) The MRA revealed minimal displacement of his anterior cerebral arteries toward the right consistent with mass effect. (*Id.*) The MRI revealed findings consistent with an infiltrative relatively low grade tumor/glioma[4] predominantly involving deep structures of the posterior left cerebral hemisphere (*Id.* ¶ 16; AR 104.) The MRI report also noted associated mass effect with compression of Rice's posterior left lateral ventricle and atrium of left lateral ventricle. (*Id.*)

On October 2, 2009, Rice was evaluated by Dr. Kelly Nicholas at the Nuero-Oncology Clinic at University of Chicago Medical Center to discuss his diagnosis and treatment options. (*Id.* ¶ 18; AR 192-93.) Dr. Nicholas noted that due to progressively worsening headaches during the summer of 2009, Rice had undergone a biopsy by Dr. James Chandler in August 2009,[5] which resulted in a diagnosis of low grade astrocytoma.[6] (*Id*; AR 192.) Dr. Nicholas noted that Rice felt somewhat tired, struggled to find words occasionally, but otherwise felt well and continued to work some full days and other half days. (*Id.*) Dr. Nicholas also reviewed Rice's July 31, 2009 MRI and recommended that given his age and the tumor size and mass effect, the tumor should be treated sooner rather than later. (*Id*; AR 192-93.) Specifically, Dr. Nicholas recommended radiation treatment and possibly adding Temozolomide ("TMZ") chemotherapy treatment. (*Id.*) Rice met with Dr. Nicholas on February 12 and March 12, 2010 for follow-up

---

[4] Glioma is a broad category of brain and spinal cord tumors that comes from glial cells, the main brain cells that can develop into tumors. (*Id.* ¶ 16 n. 2 (citing http://www.webmd.com/cancer/brain-cancer/malignant-gliomas).)

[5] Dr. Chandler's biopsy report was not provided to Aetna for review and therefore is not part of the Administrative Record. However, Dr. Nicholas reported in narrative letters dated January 28 and April 4, 2011 that Rice had undergone a biopsy on August 28, 2009. (Def. 56.1 Resp. ¶ 13.)

[6] Astrocytomas are a type of glioma. http://www.mayoclinic.org/glioma/types.html. These tumors arise from astrocytes, which are star-shaped cells that make up the "glue-like" or supportive tissue of the brain. (Def. 56.1 St. ¶ 18 n. 4 (citing http://www.abta.org/understanding-brain-tumors/types-of-tumors/astrocytoma.html).)

during his radiation and chemotherapy. (*Id.* ¶ 19; AR 188, 190.) During these appointments Dr. Nicholas noted complaints of headaches and fatigue. (*Id.*) He also noted that a February 2, 2010 brain MRI indicated that Rice was stable, showing evidence of diffuse involvement of both hemispheres. (*Id.*)

On April 9, 2010, Rice underwent a biopsy that revealed findings consistent with Glioblastoma Multiforme ("GBM"), a malignant brain tumor.[7] (*Id.* ¶ 20; AR 185.) While, Dr. Nicholas noted that Rice remained clinically stable with no significant deficits, he recommended altering Rice's chemotherapy treatment to include Avastin. (*Id*; AR 186-187.) Dr. Rimas Lukas, M.D. at the University of Chicago Medical Center, evaluated Rice on April 16, 2010 to discuss treatment options for Rice's recently diagnosed GBM. (*Id.* ¶ 20; AR 185.) Dr. Lukas noted that after Rice had undergone three rounds of adjuvant TMZ, an imaging study revealed an area of enhancing lesion adjacent to the left lateral ventricle. (*Id.*)

Rice saw Dr. Nicholas on May 14, June 11, and July 9, 2010 for follow-up chemotherapy treatment for his GBM. (*Id*; AR 179, 181, 183.) Dr. Nicholas noted that although Rice was experiencing treatment and tumor-related side effects of fatigue and cognitive deficits, he remained clinically and radiographically stable on his treatment of Avastin and TMZ. (*Id.*) Specifically, at Rice's May 14, 2010 appointment, Dr. Nicholas noted that Rice was doing well, that his energy was good, and that he continued to work full time. (*Id.*; AR 181-84.) On June 11, 2010, Dr. Nicholas reported that Rice had more energy and, based on a June 10, 2010 MRI, was clinically and radiographically improved. (*Id.*) On July 9, 2010, Nicholas noted that although

---

[7] A Grade IV astrocytoma, known as Glioblastoma, is the most common and aggressive type of astrocytoma. These tumors tend to infiltrate throughout the area of the brain where the tumor is located, making them more difficult to completely remove surgically. GBM is the most common malignant primary brain tumor. Grade IV tumors tend to recur and are rarely cured. (Def. 56.1 St. ¶20 n. 5 (citing http://www.webmd.com/cancer/brain-cancer/glioblastoma-multiforme); http://mayoclinic.org/glioma/types.html.

Rice was doing a fair amount of work from home, he remained clinically and radiographically stable. (*Id.*; AR 179.)

Rice ceased working at Westin on July 16, 2010 due to malignant neoplasm of the brain and chemotherapy treatment. (*Id.* ¶ 12.) He then applied for and received short-term disability benefits under Aetna's short-term disability Policy, alleging a date of disability of July 16, 2010. (*Id.* ¶ 24; AR 2, 228.) On July 21, 2010, Dr. Nicholas completed an attending physician statement in support of a long-term disability benefits claim. (*Id.* ¶ 22; AR 126-27.) Dr. Nicholas noted in the statement that Rice was unable to work due to tumor-related side effects of decreased memory, difficulty multi-tasking, decreased concentration, as well as treatment-related side effects of fatigue and nausea. (*Id.*) The next day, July 22, 2010, Rice saw Dr. Balandrin, who listed Rice's diagnoses as GBM and depression. (*Id.* ¶ 23; AR 162.) On or about September 10, 2010, Rice applied for long-term disability benefits under the Policy. (Pl. 56.1 St. ¶ 16; AR 2, 39, 51.) If approved, Rice's long-term disability benefits would have become effective on October 18, 2010, at the end of his short-term disability period. (Def. 56.1 St. ¶ 24; AR 2, 39, 51.) However because Rice's first date of disability (July 16, 2010) was less than 12 months after his coverage began (August 1, 2009), his claim was subject to a pre-existing condition review to determine whether he had been diagnosed, treated, or had received medication for his alleged disability condition during the three months prior to his effective date of coverage. (*Id.* ¶ 13; AR 22.)

## II.  Relevant Policy Language

Under the terms of the Policy, an insured is considered disabled when Aetna determines that (1) the insured cannot "perform the material duties of [his or her] own occupation solely

5

because of an illness, injury or disabling pregnancy-related condition," and (2) the insured's "earnings are 80% or less of [his or her] adjusted pre-disability earnings." (*Id.* ¶ 7; Policy 100.) The Policy also contains the following exclusion for pre-existing conditions:

> A pre-existing condition is an illness, injury, or pregnancy-related condition for which, during the 3 months before your coverage or increase in coverage became effective:
>
> -you were diagnosed or treated;
> -you received diagnostic services; or
> -you took drugs that were prescribed or recommended by a physician.
>
> The plan does not pay for benefits for a disability caused, or contributed to, by a pre-existing condition, if the disability starts within the first 12 months after your coverage goes into effect.

(*Id.* ¶ 8; Policy 102-103.)

Aetna reviews and determines eligibility for long-term disability claims pursuant to the terms of the Policy and the Plan. (*Id.* ¶ 6.) The Plan confers upon Aetna discretionary authority to:

> determine whether and to what extend eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under the Policy, the Certificate or any other document incorporated herein. We shall be deemed to have properly exercised such authority unless We abuse our discretion by acting arbitrarily and capriciously.

(*Id.* ¶ 10; Policy 87.)

### III.    Aetna's Claim Review Process

It is Aetna's practice to evaluate claims fairly without regard to the manner in which the Plan is funded and to pay claims consistently and in accordance with the applicable benefit provisions. (*Id.* ¶ 46.) Aetna seeks to ensure that those payable under the Plan are paid and claims not payable under the Plan are denied. (*Id.*) Aetna recognizes that paying claims that are

not payable under the Plan does not benefit persons insured under the Plan as a group and that such payments could result in reduced benefits to the detriment of all participants and beneficiaries. (*Id.* ¶ 47.)

Aetna has in place a quality assurance program to confirm the accuracy of claim decisions. (*Id.* ¶41.) Aetna employees who make decisions regarding claims filed by Plan participants, including appeals, are paid fixed salaries and performance bonuses that are wholly unrelated to the number of claims paid or claims denied. (*Id.* ¶ 42.) Aetna does not establish numerical guidelines or quotas regarding claim payments or claim denials, nor are Aetna employees evaluated on the basis of the amount or number of claims paid or denied. (*Id.* ¶¶ 43-44.) Rather, employees are evaluated on the quality of their claim decisions, *i.e.*, whether the claims were handled correctly in accordance with the applicable plan documents. (*Id.* ¶ 44.) Aetna does not discourage its employees from paying legitimate claims. (*Id.* ¶ 45.)

Aetna maintains a separate appeals unit for the consideration of denied claims on appeal. (*Id.* ¶ 48.) Employees in the appeals unit make an independent assessment of the claim decision based on all of the evidence in the claim file. (*Id.* ¶ 49.) The employee responsible for an appeal does not discuss the claim with the individual who made the initial benefits determination. (*Id.* ¶ 50.) Neither the employees who review claims for benefits nor the employees who review appeals of denied claims have information regarding Aetna's profits and losses (other than information that is publicly available). (*Id.* ¶ 51.) Employees are also unfamiliar with the process by which Aetna establishes claim reserves. (*Id.*) Furthermore, the claims department and appeal unit are completely separate business units from the financial underwriters. (*Id.* ¶ 52.) Neither the claim department nor the appeal unit seeks approval from financial underwriters in order to

make claim decisions and the financial underwriters do not advise or influence the claim department or appeals unit with respect to whether or not to play a claim. (*Id.* ¶¶ 53-54.) Aetna's Senior Executive Vice President/Chief Financial Officer, Chief Enterprise Risk Officer, Vice President of Business Operations Finance, and Vice President and Chief Investment Officer of Pension and Investment Management do not have any involvement whatsoever in claim decisions. (*Id.* ¶ 55.)

### IV. Aetna's Review of Rice's Long-Term Disability Benefits Claim

Aetna began its review of Rice's long-term disability claim on September 10, 2010. (*Id.* ¶ 24; AR 2, 39, 51.) On October 7, 2010, Aetna notified Rice that a pre-existing condition review was necessary because Rice's date of disability was within 12 months of his effective date of coverage under the Policy. (*Id.* ¶ 25; AR 160, 274.) Aetna explained to Rice that it had to determine whether Rice had received medical treatment or services, or was prescribed medication for a pre-existing condition during the three-month period between May 1, 2009 and July 31, 2009 (the "pre-existing look back period").

As part of its review, Aetna received from Dr. Balandin Rice's medical records and a narrative letter summarizing Rice's treatment. (*Id.* ¶ 26; AR 34, 159-165.) In the letter, Dr. Balandrin stated that Rice came to his office on July 6, 2009 complaining of headaches. (*Id*; AR 161.) Dr. Balandrin also stated in the letter that it was his impression that Rice suffered from tension type headaches, likely stress-related. (*Id.*) Dr. Balandrin went on to explain that an MRI was performed on Rice on July 31, 2009, the results of which were not reported until August 1, 2009 and not received until August 3, 2009 (*Id.*) Dr. Balandrin stated that although a brain

tumor was suspected when the results of the MRI came in, the actual diagnosis of glioma did not occur until after August 1, 2009. (*Id.*)

On October 29, 2010, Aetna performed a "roundtable" review of Rice's claim, which included Regina McDonald from Aetna's medical staff. (*Id.* ¶ 27; AR 33.) Upon review, Aetna determined that a clinical opinion was needed to complete the pre-existing condition review for Rice's claim. (*Id.*) On November 2, 2010, Aetna performed a triage review of Rice's claim, which included clinical review by Rozana Latchman. (*Id.* ¶ 28; AR 34-35.) Based on the July 2009 MRI revealing findings consistent with a low-grade tumor/glioma and Dr. Balandrin's assessment on July 6, 2009 that Rice was complaining of headaches, Latchman concluded that even though the official glioma diagnosis was not made until after August 1, 2009, Rice had a pre-existing condition because his treatment took place during the pre-existing look back period. (*Id.*)

On November 10, 2010, Aetna notified Rice that his claim for long-term disability benefits had been denied because his disability arose from a pre-existing condition. (*Id.* ¶ 29; AR 290.) Aetna explained that Rice's long-term disability claim was based on a diagnosis of malignant neoplasm of the brain secondary to brain tumor and that the July 31, 2009 MRI and MRA revealed findings consistent with a low grade tumor/glioma, which fell within Rice's pre-existing look back period of May 1, 2009 to July 31, 2009. (*Id.* ¶ 29; AR 290-291.)

**V.     Rice's Appeal**

Rice appealed Aetna's decision on February 25, 2011. (*Id.* ¶ 30; AR 93-95.) Rice maintained on appeal that he had a long history of suffering from headaches prior to visiting Dr. Balandrin with headaches on July 6, 2009. (*Id.*) Rice also asserted that while his MRI began on

July 31, 2009 – within the pre-existing look back period – it was not completed until after midnight and not read by anyone until just after the end of the pre-existing look back period. (*Id*; AR 93-94.)  Rice further argued that his headaches and benign tumor were not his disabling condition and that the disabling condition was GBM, which did not exist on August 28, 2009 but was subsequently revealed as a new diagnosis after he underwent a biopsy in April 2010. (*Id.* ¶ 31; Pl. 56.1 St. ¶¶ 20-21; AR 94, 142.)

In support of his appeal, Rice submitted a narrative letter from Dr. Nicholas dated January 28, 2011. (Def. 56.1 St. ¶ 32; AR 141.)  In that letter, Dr. Nicholas states that Rice's glioma was diagnosed pursuant to the biopsy performed by Dr. Chandler on August 28, 2009. (*Id.*)  According to Dr. Nicholas, Rice's condition, by definition, could not have been diagnosed until the pathologist completed review of the surgical tissue. (*Id.*)  Rice submitted a second letter from Dr. Nicholas dated April 4, 2011. (*Id.* ¶ 33; AR 142.)  Dr. Nicholas opined in the April 4 letter that Rice was diagnosed with a low-grade glioma on August 28, 2009, at which time he had no neurological defects and was able to continue to work. (*Id.*)  Dr. Nicholas also stated that an MRI preformed on Rice on August 31, 2010 demonstrated an increased enhancement and that a biopsy performed on April 8, 2010 revealed a "new diagnosis" of GBM. (*Id.*)  According to Dr. Nicholas, this new diagnosis, unlike the old one, resulted in neurological deficits that eventually rendered Rice disabled. (*Id.*)

As part of its appeal review, Aetna obtained a medical file reviewed by Dr. Vaughn Cohan, a board-certified neurologist, on June 6, 2011. (*Id.* ¶ 34; AR 87-89.)  After reviewing the medical information and speaking with Rice's physician, Dr. Cohan concluded that Rice was seen and treated for his brain tumor during the pre-existing look back period of May 1, 2009 to

July 31, 2009. (*Id.*; AR 89.) Specifically, Dr. Cohan noted that Rice presented to Dr. Balandrin on July 6, 2009 complaints of headaches and that a brain MRI and MRA were performed at Dr. Balandrin's request on July 31, 2009. (*Id.* ¶ 35; AR 88.) Dr. Cohan observed that the MRI report revealed suspicious infiltrative lesion noted in the deep structures of the posterior left cerebral hemisphere crossing toward the right side at the splenium of the corpus callosum, which was associated with the mass effect and compression of the posterial left lateral ventricle and atrium of the left lateral ventricle, and also revealed a parafalcine shift toward the right. (*Id.*) Dr. Cohan noted that the subsequent biopsy proved consistent with a primary neoplasm of the brain, specifically GBM. (*Id.*)

Dr. Cohan contacted Dr. Balandrin and spoke with him on July 2, 2011. (*Id.* ¶ 36; AR 88.) Dr. Balandrin stated that he had treated Rice for over 20 years and that his medical records did not reflect any previous complaints of headache or treatment for headaches other than a transient episode of frontal pain associated with sinusitis in 1997. (*Id.*) Dr. Balandrin also confirmed that on July 6, 2009, Rice presented with new complaints of occipital and frontal headaches for which a brain MRI and MRA were ordered. (*Id.*) Based on the above, Dr. Cohan concluded that it was more likely than not that Rice's headache complaints on July 6, 2009 represented a symptom related to his underlying primary brain neoplasm. (*Id.* ¶ 37; AR 89.) Dr. Cohan explained that this would certainly be typical as a presenting symptom and would be especially likely in consideration of Rice's medical history of not having prior chronic headaches. (*Id.*) Dr. Cohan thus concluded that Rice's glioma was clearly present prior to August 1, 2009 and that "there [could] be no doubt at all from a medical perspective that [Rice's] disabling condition was present during the relevant preexisting period, 5/1/09 to 7/31/09." (*Id.*)

11

Dr. Cohan further stated that Rice was "clearly seen and treated for his brain tumor during the aforementioned period 5/1/09 through 7/31/09." (*Id.* ¶ 38; AR 89.)

On July 27, 2011, Aetna notified Rice that it was upholding its denial of long-term disability benefits based on the Policy's pre-existing condition exclusion. (*Id.* ¶ 39; AR 303-305.) Rice filed this lawsuit on December 9, 2011. (*Id.* ¶ 40.)

## STANDARD OF REVIEW

### I.    The Court Applies the Arbitrary and Capricious Standard in Reviewing Aetna's Decision to Deny Rice' Long-Term Disability Claim

On cross-motions for summary judgment, each movant must satisfy the requirements of Federal Rule of Civil Procedure 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).  Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

However where the district court is asked to review a denial of disability benefits under an ERISA plan that grants the administrator or fiduciary discretion to determine eligibility and construe plan terms, courts apply the more deferential standard described below and not the traditional summary judgment standard. *See Holstrom v. Metro Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (applying deferential standard of review in evaluating denial of disability benefits without referring to traditional summary judgment analysis); *Davis v. Unum Life Ins. Co.*, 444

F.3d 569, 575-76 (7th Cir. 2006) (same); *see also St. Clare v. Unum Life Ins. Co.*, No. 1:11-0067-JMS-MJD, 2012 WL 1666619, at *8 n. 7 (S.D. Ind. May 11, 2012).

ERISA does not set out the appropriate standard of review for actions under § 1332(a)(1)(B) challenging benefit eligibility determinations. To fill this gap, courts have held that a denial of insurance benefits is reviewed *de novo* under ERISA "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114-15 (1989); *see also Black v. Long Term Disability Ins.*, 582 F.3d 738, 743 (7th Cir. 2009); *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 980 (7th Cir. 1999). When the plan gives the administrator discretionary authority, the court "will set aside an administrator's decision only if it is arbitrary and capricious." *Black*, 582 F.3d at 743-44 (citing *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 332 (7th Cir. 2000); *Hess v. Reg-Ellen Mach. Tool Corp. Employee Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007). In this case, the parties do not dispute that the Plan grants discretion to the claims administrator to determine eligibility for benefits and construe the terms of the Plan. Accordingly, the Court reviews Aetna's denials of Rice's claim using the arbitrary and capricious standard.

Under the arbitrary and capricious standard, the reviewing court "do[es] not ask whether the administrator reached the correct conclusion or even whether it relied on the proper authority. Instead, the only question for [the court] is whether the administrator's decision was completely unreasonable." *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005) (citing *Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1379 (7th Cir. 1997), *Manny v. Cent. States, Southeast and Southwest Areas Pension and Health and Welfare Funds*, 388 F.3d 241, 243 (7th Cir. 2004)); *see*

13

*also Dougherty v. Indiana Bell Telephone Co.*, 440 F.3d 910, 917 (7th Cir. 2006) ("Put simply, a[n] [administrator's] decision will not be overturned unless it is downright unreasonable.") (citations omitted). Any reasonable interpretation of the Plan will not be set aside regardless of "whether the result reached by the administrator is one [the court] would have arrived at in the first instance." *See James v. GM Corp.*, 230 F.3d 315, 317 (7th Cir. 2000) (citing *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir. 1998)). Though deferential, the arbitrary and capricious standard does not allow the courts to " 'rubber stamp' the administrator's decision." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (citing *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771 (7th Cir. 2003)). Rather, the court will uphold the plan's decision if "(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of the relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Sisto v. Ameritech Sickness and Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005) (quoting *Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990, 995 (7th Cir. 2004)).

In applying the arbitrary and capricious standard, the Court's review of an ERISA benefit determination is limited to the administrative record that was before the administrator at the time of its final decision. *See Perlman*, 195 F.3d at 981-82 ("Deferential review of an administrative decision means review on the administrative record."). If the administrator's determination "has rational support in the record," it will be upheld. *Speciale*, 538 F.3d at 621 (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006). The Court is not bound by the Federal Rules of Evidence when reviewing an ERISA administrator's benefits determination. *See*

14

*Black*, 582 F.3d at 746 n. 3 ("The Federal Rules of Evidence … do not apply to an ERISA administrator's benefit determination, and we review the entire administrative record, including hearsay evidence relied upon by the administrator.") (citing *Speciale*, 538 F.3d at 622 n. 4).[8]

In reviewing the parties' motions, the Court will limit its analysis of the facts to evidence that is properly identified and supported in the parties' Local Rule 56.1 statement. *See Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court will accept that statement as true for the purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). Neither party seeking summary judgment may rely on mere conclusions and allegations to create factual issues. *Bladerston v. Fairbanks Morse Engine Div. Of Coltec Ind.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).

## II. Aetna's Conflict of Interest

---

[8] Typically, evidence deemed inadmissible pursuant to the Federal Rules of Evidence is not properly before the court on summary judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely on inadmissible hearsay to oppose a motion for summary judgment."); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (inadmissible hearsay not enough to preclude summary judgment); *Esenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (hearsay is inadmissible in summary judgment proceedings to the same extent it is inadmissible at trial).

### A. The Court Must Consider Aetna's Conflict of Interest in Determining Whether It Acted in an Arbitrary and Capricious Manner

The Supreme Court's decision in *Metropolitan Life Insurance v. Glenn*, 554 U.S. 105 (2008), imposes one additional consideration in cases where "responsibility for both claim determinations and pay-outs is vested in the same entity." *See Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 831 (7th Cir. 2009). In such cases, the court must remain cognizant of the "obvious conflict of interest" that arises when the plan administrator is responsible for both evaluating claims and paying benefits. *Id.* In such cases, "the court is required to take such an obvious conflict of interest into consideration." *Id.* In this case, it is undisputed by the parties that Aetna insured the Policy, processed claims under the Policy, and made determinations of benefits eligibility under the Policy. Thus, even though "the correct standard of review to be applied … remains the arbitrary and capricious standard, … one of the factors that must be taken into account in applying that standard is any conflict of interest" that arises from this arrangement. *See Fischer v. Liberty Life. Assur. Co. of Boston*, 576 F.3d 369, 375 (7th Cir. 2009); *see also Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 364 (7th Cir. 2011) (In cases where "a plan administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due …. the standard of review remains the same, that is, arbitrary and capricious") (citing *Glenn*, 554 U.S. at 108); *Black*, 582 F.3d at 745 ("While we must take [the plan's] conflict of interest into account, [the plan administrator] remains entitled to the deference normally afforded under the arbitrary and capricious standard."). The presence of a conflict will "act as a tiebreaker when [ ] other factors are closely balanced," but does not play "an important role" in non-borderline cases. *Fischer*, 576 F.3d at 377.

## B.      The Court Gives Little Weight to Aetna's Conflict of Interest

Rice maintains that Aetna's decision to deny coverage must be construed as arbitrary and capricious, "particularly in light of the more stringent standard required by the inherent conflict of interest of the Defendant." (Dkt. No. 56, p. 9.)  The Court notes as a preliminary matter that Rice has either misunderstood or mischaracterized the standard a district court must apply in reviewing a plan administrator's determination.  Rice frames his position to suggest the Court should apply a "heightened arbitrary and capricious standard" in cases where the plan administrator is also the distributor of benefits.  As explained above, the Seventh Circuit has expressly rejected such a reading of *Glenn*. *See Leger*, 557 F.3d at 831 ("[T]he Court's decision in *Glenn* did not create a new standard of review – a 'heightened arbitrary and capricious standard' – for claims involving a conflict of interest.").  Thus contrary to Rice's suggestion that the Court apply "a more stringent standard," the law is clear that a conflict of interest is merely one factor that must be weighed along with all other relevant factors in determining whether the administrator's decision was arbitrary and capricious. *See Black*, 582 F.3d at 744-45.

Recognizing that "a conflict of interest … is a given in almost all ERISA cases," the Seventh Circuit has held that it is "not the existence of a conflict of interest … but the *gravity* of the conflict, as inferred from the circumstances, that is critical." *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009) (emphasis in original); *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 450 (7th Cir. 2009) ("A structural conflict is one factor among many that are relevant in the abuse-of-discretion analysis – including whether the administrator overemphasized medical reports that favored its decision and whether it gave its medical

17

examiners all of the relevant evidence ….").  The Seventh Circuit has also set forth a general

framework for determining the gravity of the conflict:

> [T]he gravity of the conflict, and thus the likelihood that the conflict influenced the plan administrator's decision, should be inferred from the circumstances of the case, including the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims.

*Majeski v. Metropolitan Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009) (citing *Marrs*, 577 F.3d

at 789).  In *Glenn*, the Supreme Court suggested that a plan's conflict of interest may prove to be

"tiebreaking" in a case where "circumstances suggest a higher likelihood that [the conflict]

affected the benefits decision, including, but not limited to, cases where an insurance company

administrator has a history of biased claims administration." 554 U.S. at 117.  Otherwise, the

district court should "presume that a fiduciary is acting neutrally unless a claimant shows by

providing specific evidence of actual bias that there is a significant conflict." *Kobs*, 400 F.3d at

1039 (quoting *Mers v. Marriot Int'l Group Accidental Death and Dismemberment Plan*, 144

F.3d 1014, 1020 (7th Cir. 1998)).

In this case, the Court finds little to no substance behind Rice's claim that Aetna's denial

of his long-term disability benefits claim was tainted by a conflict of interest.  The record

demonstrates that Aetna has put in place reasonable procedures through which its employees

decide claims and has erected safeguards to minimize the impact of any conflict that arises

inherently from its role as both the claims administrator and distributor of benefits.  Rice does

not dispute that (1) it is Aetna's practice to evaluate claims fairly without regard to the manner in

which the Plan is funded and to pay claims consistently and in accordance with the applicable

benefit provisions; (2) Aetna maintains a quality assurance program to confirm the accuracy of

18

claim decisions; (3) Aetna employees who make decisions regarding the claims of Plan participants are paid fixed salaries and performance bonuses that are wholly unrelated to the number of claims paid or denied; (4) Aetna maintains a separate appeals unit, the employees of which do not discuss claims under their review with the employee who made the initial benefits determination; and (5) neither the claims department nor the appeals unit seek approval from financial underwriters in order to make claims decisions and financial underwriters do not advise or influence the claim department or appeal unit with respect to whether or not to pay a claim.

Rice points to no facts suggesting a history of biased claims administration at Aetna, nor does he offer specific evidence to suggest the presence of actual bias. Rather, in lieu of substantive facts or argument to support his conflict-of-interest theory, Rice's counsel simply offers his own personal opinion that a conflict must exist in this type of case. (Dkt. No. 56, p. 5 ("After having spent 17 years in house with a major insurance company involved with both ERISA and general liability claims; I find it somewhat incredible to assert that each successive claim representative is not aware of the ultimate fact that the more money the company takes in and the less money the company pays out the more profitable the company is.")). The Court finds Plaintiff's counsel's speculative conclusions regarding the motives of employees who make claims determinations in the insurance industry insufficient. Furthermore, courts have specifically rejected arguments seeking to establish bias solely based on the link between the defendant's profits and the individual claims representative's pocketbook. *See, e.g., Gessling v. Group Long Term Disability Plan for Employees of Sprint/United Mgmt. Co.*, 693 F.Supp.2d 856, 871 (S.D. Ind. 2010) (finding that although plaintiff "has demonstrated that the individual employees who considered and denied his claim were paid a salary and received bonuses that

19

were tied to Hartford Life's stock performance," "it is too great a leap to assume that individual employees would—or did—deny claims because they thought that doing so would have a direct impact on their salaries or bonuses. In a company as huge as Hartford Life, the connection between the denial of an individual claim and the denying employee's pocket simply too attenuated") (emphasis removed); *Phillips v. Guardian Life Ins. Co. of Am.*, No. 3:08-00660, 2011 WL 1134300, at *6 (M.D. Tenn. Mar. 25, 2011) (finding it "highly unlikely" that a conflict of interest affected the defendant's decision to deny the plaintiff's disability claim where claim handlers' bonuses were based on several criteria, including the defendant insurer's "loss ratio," explaining that because "the maximum bonus under the [defendant's] incentive program was only four percent of the employee's salary" and "only one percent of the possible four percent was based on the loss ratio[,] …. the incentive to deny a claim solely to prevent a loss was by no means overwhelming"). Thus Plaintiff's counsel's personal opinion regarding the motives of Aetna's claims representatives, without more, does not persuade the Court to find that a conflict of interest clouded Aetna's decision in this case.

Nor is the court persuaded by Rice's accusation that "one must be suspect of [Dr. Cohan's] review" because it "totally ignore[d]" Dr. Nicholas's report and involved a peer review with Dr. Balandrin rather than Dr. Nicholas. (Dkt. No. 56, p. 5.) First, it is unclear where Rice conjures the assumption that Dr. Cohan "totally ignored" his neurologist's report. It is clear from the record that Dr. Nicholas's narrative letters were among the documents reviewed by Dr. Cohan in arriving at his determination that Rice's GBM was caused, or contributed to, by a pre-existing condition. Rice's qualm, it appears, is not that Dr. Cohan ignored documents authored by Dr. Nicholas but rather that he did not accept them at face value. However Aetna is under no

obligation to favor the assessment of Rice's physicians over its own medical staff. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (plan administrators are not required to accord special deference to treating physician opinions); *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004) ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but [administrators] must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)."). Rice's argument that Aetna acted arbitrarily and capriciously because Dr. Cohan's decision gave little weight to Dr. Nicholas's opinion is therefore unconvincing.[9]

Accordingly, while the conflict of interest must be taken into account when reviewing an administrator's decision, this Court will not give the conflict significant weight in this case because the circumstances do not suggest that it was highly likely to have affected Aetna's decision to deny Rice's claim for long-term disability benefits. Furthermore, this case does not present the sort of close "tiebreaker-scenario" that would cause the conflict-of-interest factor to tip the scales in favor of Rice.

## DISCUSSION

"A claim for benefits under an ERISA-governed plan is a matter of contract interpretation. In construing the terms of "[a]n ERISA plan," "federal principles of contract construction apply." *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005). "Federal common law rules of contract interpretation parallel equivalent state rules." *Bullwinkel v. New Eng. Mut. Life Ins. Co.*, 18 F.3d 429, 431 (7th Cir. 1994) (quoting *Meredith v. Allsteel Inc.*, 11

---

[9]  Contrary to Rice's assertion, Rice was also not required seek "outside or independent review" before denying Rice's claim. *See Davis*, 444 F.3d at 576 ("[T]o the extent that the district court would have preferred that [the defendant insurer] supplement and verify its doctors' opinions with that of an outside doctor, the district court went beyond the bounds of arbitrary-and-capricious review.").

F.3d 1354, 1358 (7th Cir. 1993)).  Thus the Court will "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience," construing any ambiguities against the drafter. *Id.* (quoting *Meredith*, 11 F.3d at 1358).

Under the terms of the Policy, a pre-existing condition is defined as "an illness, injury, or pregnancy-related condition" for which, during the three months before the employee's coverage began, the employee was either (1) diagnosed or treated; (2) received diagnostic services; or (3) took drugs that were prescribed or recommended by a physician. (Def. 56.1 St. ¶ 8; Policy 102-103.)  The parties do not dispute that that Rice had a pre-existing condition during the pre-existing look back period.  Rice argues, however, that Aetna's decision to deny coverage is unsupported by the record and must be construed as arbitrary and capricious because his pre-existing condition – a glioma – was not disabling and therefore cannot preclude him from receiving long-term disability benefits under the Plan.  According to Rice, his disabling condition, GBM, was a new condition different from his preexisting glioma and did not develop until after the pre-existing look back period.  Thus Rice argues that GBM cannot form the basis of Aetna's decision to exclude coverage.

First, the Court notes that it is of no consequence that Rice's glioma was not officially diagnosed until after the pre-existing look back period.  In *Levin v. Sun Life Assur. Co.*, No. 06 C 2617, 2008 WL 834432 (N.D. Ill. Mar. 27, 2006) (Pallmeyer, J.), for example, the court, applying *de novo* review,[10] upheld the administrator's denial of long-term disability benefits where the plaintiff was treated for symptoms of dysphagia (difficulty swallowing) during the pre-existing look back period but was not officially diagnosed until after the effective date under

_____

[10] The court applied *de novo* review because the parties agreed in *Levin* that the plan administrator *did not* have discretion over the interpretation of the plan. *Levin*, 2008 WL 834432, at *10.

the policy. *Id.* at *4–9. The court found that the plaintiff was treated during the pre-existing condition period for "the very same symptoms that, as they worsened, ultimately led to his disability." *Id.* at *14. The court found "no indication [ ] that [the plaintiff's] symptoms could have been anything but dysphagia, whether or not it was diagnosed as such at the time." *Id.* (citing on *Bullwinkel v. New Eng. Mut. Life Ins. Co.*, 18 F.3d 429, 432-33 (7th Cir. 1994) (finding claim for medical insurance properly denied where plaintiff was unaware that she had breast cancer during the pre-existing condition period but was diagnosed after the effective date of coverage, finding that the lump in the plaintiff's breast identified during the pre-existing condition period was "not a trivial and inconclusive symptom" and that her doctor visits "actually concerned" the same condition for which she later sought insurance coverage)).

Similarly, in *Kirk v. Provident Life & Acc. Ins. Co.*, 942 F.2d 504, 505 (8th Cir. 1991), the plaintiff began consulting with a physician in March 1998, during the pre-existing look back period. *Id.* at 505. During a consultation within that period, the physician expressed suspicion that a congenital heart disease may have produced a bacterial vegetation (or growth) in the insured's heart lining, thus causing the insured's symptoms. *Id.* at 506. A blood culture did not confirm that suspicion and the plaintiff was "relatively symptom-free" for the remainder of the pre-existing look back period and through the first month of his coverage period, which began May 1, 1998. *Id.* 506-07. However the plaintiff's condition worsened, leading to a diagnosis of bacterial endocarditis (a heart valve infection) and surgery in July 1998. *Id.* at 506. The Eighth Circuit found that the plaintiff was properly denied coverage under the policy's pre-existing condition exclusion because "[t]he doctors who examined [the plaintiff] were in agreement that the symptoms for which [he] sought treatment in March 1998, stemmed from bacterial

endocarditis; that is, the disease first manifested itself, or became active, in March." *Id*; *see also Cury v. Colonial Life Ins. Co.*, 737 F.Supp. 847, 849 (E.D. Pa. 1990) (insurance coverage properly denied where pre-existing condition provision excluded coverage for any disability caused by, contributed to by, or resulting from a pre-existing condition, finding it irrelevant that the insured's condition was not diagnosed until after the coverage period commenced). Therefore as long as the record reasonably supports Aetna's determination that Rice suffered from a glioma between May 1 and July 31, 2009, the fact that the glioma was not officially diagnosed until almost a month after Rice's effective date of coverage is irrelevant. Based on Rice's July 31, 2009, which revealed findings consistent with a low-grade tumor/glioma, it was reasonable for Aetna to conclude that Rice suffered from a pre-existing condition during the look back period.

Next, the record reasonably supports Aetna's determination that Rice's glioma caused or contributed to his GBM. Given the Policy's broad language governing pre-existing conditions, Rice's focus on whether his glioma was disabling and whether his GBM was a "new diagnosis" is misplaced. The Policy's provision excluding coverage for pre-existing conditions states that "[t]he plan does not pay for benefits for a disability *caused, or contributed to,* by a pre-existing condition, if the disability starts within 12 months after [the employee's] coverage goes into effect." (Def. 56.1 St. ¶ 8; Policy 102-103) (emphasis added). Thus the question is not whether Rice's diagnosis of GBM was a "new" or "different" diagnosis but rather whether there is "rational support in the record" for Aetna's determination that Rice's GBM was a progression of his original brain tumor and therefore was "caused, or contributed to, by" his glioma. *See Speciale*, 538 F.3d at 621 (quoting *Davis*, 444 F.3d at 576); Policy 102-103. For example, in

24

*Topazian v. Aetna Life Ins. Co.*, No. 10 C 4702, 2011 WL 3419375 (N.D. Ill. Aug. 1, 2011) (Hibbler, J.), the court analyzed the same pre-existing condition limitation at issue in this case and rejected the plaintiff's argument that he was not barred by the pre-existing condition limitation because his post-effective date diagnosis was different from his diagnosis during the pre-existing look back period. *Id.* at *6-8. The plaintiff in that case had received various forms of treatment for his lower back condition in the years leading up to his enrollment in a policy underwritten and funded by Aetna. *Id.* at *2-3. Within one year of the effective date of the policy, the plaintiff ceased working and submitted a claim for short-term disability benefits. *Id.* at *4. That claim was granted but the plaintiff's subsequent claim for long-term disability benefits was denied on the basis that he was requesting benefits for a pre-existing condition. *Id.* at *4. After exhausting Aetna's appeal process, the plaintiff filed suit in federal court arguing that Aetna's decision was arbitrary and capricious because his disabling condition, "failed back syndrome," was a new condition unrelated to the herniated disk problems he suffered from during the pre-existing limitation period. *Id.* at *6. The court disagreed, finding that although "the nature of [the plaintiff's] problems ha[d] changed over time" and may in fact have been worsened by his most recent surgery, "this [did] not mean that his current disability was not 'caused or contributed to' by his long-standing back problems." *Id.* The court concluded that "Aetna did not act unreasonably in heeding the opinions of its retained physicians, who concluded that [the plaintiff's] present condition was simply a progression in his history of disk disease." *Id.* at *7.

In this case, Aetna has offered a reasoned explanation that is supported by the record for its denial of Rice's claim. On July 31, 2009, during the pre-existing look back period, Rice

underwent an MRI. That MRI was recommended to Rice after he presented complaints of headaches to his primary care physician, Dr. Balandrin, on July 6, 2009. The MRI report showed evidence of a low grade tumor/glioma on the left cerebral hemisphere of Rice's brain. Rice's neuro-oncologist, Dr. Nicholas, noted that a March 31, 2010 MRI revealed an increase in enhancement of the same tumor detected in Rice's brain during the pre-existing look back period. (AR 142.) Just over a week later, on April 8, 2010, Rice underwent a biopsy, the results of which were consistent with GBM. (AR 113.) This record clearly evidences – and at a minimum reasonably supports – that Rice's condition first manifested itself or became active during the pre-existing look back period and then progressively worsened into a malignant brain tumor. Therefore, the Court finds that Aetna's did not act unreasonably in concluding that Rice's pre-existing brain tumor "caused, or contributed to" the malignant brain tumor that resulted in his disability. *See, e.g., Atkinson v. Quorum Health Group, Inc.*, No. 1:03-CV-00811-DFH-VS, 2004 WL 3059795 (S.D. Ind. Dec. 16, 2004) (finding "nothing arbitrary or capricious in [the] defendants' conclusion that the disabling condition was an aggravation of the same condition" examined during the final month of plaintiff's pre-existing limitation period). Contrary to Rice's assertion, the question of whether the pre-existing condition was identical to "the disabling condition" is beside the point.

Rice relies heavily on *Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407 (7th Cir. 1996), to support his position that Aetna's decision to deny his claim based on a pre-existing condition was arbitrary and capricious. In *Pitcher*, the insured made three visits to a doctor during the pre-existing look back period. *Id.* at 409. These visits included (1) a July 31 routine physical examination, during which breast lumps were identified but presumed to be related to the

26

insured's longstanding fibrocystic breast condition; (2) a September 15 follow-up examination; and (3) a September 15 mammogram. *Id.* at 411-12. On September 18, 1992, one day after the effective date of the insured's medical insurance, a biopsy performed on the insured's left breast revealed a malignant tumor. *Id.* at 409. The insured had the growth removed, underwent radiation treatment, and subsequently sought reimbursement for "the costs she incurred for all the cancer-related procedures *subsequent* to the effective date of the policy, i.e., the biopsy and the lumpectomy, as well as the radiation treatments." *Id.* at 410 (emphasis in original). After reviewing the plaintiff's medical records the defendant denied coverage, finding that the plaintiff had received "treatment or service" for breast cancer within the ninety-day period prior to the effective date of the policy. *Id.* The Seventh Circuit affirmed the district court's determination that summary judgment in favor of the plaintiff was proper and that the plaintiff was entitled to recover under the insurance policy because she did not receive "treatment or service" for breast cancer during the pre-existing look back period. *Id.* at 418. The court explained that because the insured had been receiving treatment for the fibrocystic breast condition for approximately twenty years, neither she nor her physician had any reason to believe that the breast lumps were cancerous. *Id.* at 409, 412.

Rice's reliance on *Pitcher* is misplaced for three reasons. First, unlike the Policy at issue here, the insurance policy in *Pitcher* did not contain language expressly giving the plan administrator or fiduciary the discretion to determine eligibility for benefits or to construe the terms of the plan. *See Pitcher v. Principal Mut. Life Ins. Co.*, 870 F.Supp. 903, 906 (S.D. Ind. 1994). The insurance company's denial of benefits was therefore reviewed *de novo*, not under the arbitrary and capricious standard that governs the Court's review in this case. *Pitcher*, 93

F.3d at 411. Here, Aetna's Policy expressly grants its fiduciaries and administrators discretion to determine benefits eligibility and construe the plan's terms. Thus the Court must apply a more deferential standard of review than applied by the *Pitcher* court. Unlike *Pitcher*, the question here is not "whether [this Court] would have [denied Rice] benefits, but whether [Aetna's] decision to do so finds 'rational support in the record.' " *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009); *see, e.g., Wagner v. Allied Pilots Assoc. Disability Income Plan*, 08 C 2750, 2009 WL 1393622 (N.D. Ill. May 18, 2009) (distinguishing *Pitcher* on the basis that it involved a *de novo* review of the plan administrator's decision and ultimately holding that administrator did not "abuse its discretion" in denying plaintiff's claims);[11] *see also Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 576-77 (7th Cir. 2006) (under arbitrary and capricious review, "[t]he judicial task here is not to determine if the administrator's decision is correct, but only if it is reasonable").

Second, and more substantively, the condition in *Pitcher* for which the plaintiff sought treatment during the pre-existing look back period was found to be completely "unrelated" to the plaintiff's disabling condition. *Pitcher*, 93 F.3d at 412. Pitcher's primary care physician explained although her fibrocystic breast condition manifested in the same area of the body and in a manner similar to breast cancer, "the condition is not one which of itself causes any deterioration in health, nor does it develop into breast cancer." *Id.* at 409, 412; *see also Atkinson*, 2004 WL 3059795, at *6 ("In *Pitcher*, the key fact was that there was no connection between the

---

[11] The "arbitrary and capricious" and "abuse of discretion" standards are essentially one in the same. *See Jenkins*, 564 F.3d at 861 n. 8 ("Nit-pickers might argue that there is a distinction between the arbitrary and capricious standard of review and testing for an abuse of discretion. However, … this appears to be a distinction without a difference. They are different ways of saying the same thing. Because our cases tend to use the language of the arbitrary and capricious standard, we use that terminology here.") (internal citations and quotation marks omitted).

plaintiff's long history of benign fibrocystic breast disease and the newly-discovered cancer."). Here, Rice's treatment dating back to July 2009 demonstrates – or at the very least supports Aetna's determination – that Rice's glioma and GBM are not only related but that the former caused or contributed to the latter.

Third, the provision excluding coverage for pre-existing conditions in *Pitcher* was not nearly as broad as the provision at issue here. In *Pitcher*, the exclusion denied health insurance coverage for "a sickness or injury for which a Member … received treatment or service in the 90-day period before he or she became insured" under the policy. *Id.* at 409. The exclusion in *Pitcher*, unlike the one here, did not purport to extend to conditions "caused, or contributed to, by a pre-existing condition." Given the Policy's broad limitation precluding coverage for conditions "caused, or contributed to, by a pre-existing condition," it was not unreasonable for Aetna to conclude that the evidence linking Rice's pre-existing brain tumor with his malignant brain tumor warranted denial of his long-term disability benefits claim.

Accordingly, Rice has presented no genuine issue of material fact that Aetna's denial of benefits was arbitrary and capricious. Therefore summary judgment in favor of Aetna is proper.

## CONCLUSION AND ORDER

For the reasons stated above, Aetna's Motion for Summary Judgment is granted. Rice's Motion for Summary Judgment is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 28, 2013